**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| HERMAN MACLIN, by and through his conservator, and GWENDOLYN BLAKE, ) ) ) | |
| Plaintiffs, ) | |
| ) | No. 2:24-cv-02472-TLP-atc |
| v. ) | |
| ) | JURY DEMAND |
| ALLENBROOKE NURSING AND REHABILITATION CENTER, LLC, ) ) ) | |
| Defendant. ) | |

**ORDER GRANTING MOTION TO COMPEL ARBITRATION**

Plaintiffs Herman Maclin and his sister and conservator Gwendolyn Blake sued

Defendant Allenbrooke Nursing and Rehabilitation Center, LLC ("Allenbrooke"), in state court

for negligence.  (*See* ECF No. 1-2.)  Defendant removed the case to federal court and moved to

compel arbitration and stay the proceedings here.  (ECF Nos. 1, 3, 4.)  Plaintiff responded in

opposition to the motion (ECF No. 11), and Defendant replied (ECF No. 16).

For the reasons below, the Court **GRANTS** Defendant's motion to compel arbitration

and **STAYS** the proceedings.

**<u>BACKGROUND</u>**

Maclin first became a resident at Allenbrooke in 2016 and, aside from a hospital stay in

2022, has lived there since.  (ECF No. 1-2 at PageID 14; ECF No. 11-1 at PageID 291.)  When

he was readmitted to Allenbrooke after his hospital stint, Maclin's sister and conservator Blake

signed two documents—an Admission Agreement governing his continued residency and a

separate Jury Trial Waiver and Arbitration Agreement ("Agreement"). (*See* ECF Nos. 3-1, 3-2.)

The Agreement included this mandatory arbitration clause:

> The parties understand and agree that all claims, disputes, and controversies of any
> kind between the parties arising out of or relating in any way to the Admission
> Agreement or any service or health care provided by the Facility to the Resident
> shall be resolved exclusively by binding arbitration. This Agreement to arbitrate
> includes, but is not limited to, any dispute arising out of or in any way relating to
> this Agreement (including its validity and/or enforceability), any claim for
> payment, nonpayment or refund for services rendered to the Resident by the
> Facility, violations of any right granted to the Resident by law, breach of contract,
> fraud, misrepresentation, negligence, medical malpractice, wrongful death, or any
> other claim based on any departure from accepted standards of medical, nursing, or
> health care whether sounding in tort or contract (hereinafter collectively referred to
> as a "claim" or "claims"), as well as any claims brought by the Facility against the
> Resident.

(ECF No. 3-1 at PageID 253.)  The Agreement also specified that the Federal Arbitration Act, 9

U.S.C. §§ 1–16, and Tennessee substantive law governed any claims within the scope of the

Agreement.  (*Id.* at PageID 254.)  It also noted that executing the Agreement was a voluntary act

by the resident and that it "[wa]s not a condition of admission to, or requirement to continue to

receive care at, the facility."  (*Id.* at PageID 255–56.)  The Agreement included a thirty-day

rescission window.  (*Id.*)

On the signature page, in bold and underlined text, the Agreement stated that

> ALL PARTIES UNDERSTAND AND AGREE THAT BY ENTERING INTO
> THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING
> THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A
> COURT OF LAW BEFORE A JUDGE AND A JURY AND INSTEAD ARE
> ACCEPTING THE USE OF ARBITRATION.

> THIS JURY TRIAL WAIVER AND ARBITRATION AGREEMENT HAS BEEN
> EXPLAINED TO ME (US) IN A FORM AND MANNER (INCLUDING IN A
> LANGUAGE) THAT I (WE) UNDERSTAND.

(*Id.* at PageID 257.)  And Blake's name and signature appeared on the appropriate lines below the disclaimer, followed by the signature from Allenbrooke's representative Sharon Smith on the appropriate lines.  (*Id.*)

Maclin then returned to Allenbrooke and, in 2023, "fell and suffered injuries and harm" while at the facility.  (ECF No. 1-2 at PageID 14–18.)  Maclin and Blake sued Allenbrooke in Shelby County Circuit Court, alleging negligence under the Tennessee Medical Malpractice Act and "gross negligence, willful, wanton, reckless, malicious and/or intentional misconduct." (ECF No. 1-3 at PageID 129–32.)  And Defendants removed it to this Court (ECF No. 1) before seeking to compel arbitration (ECF No. 3).

## LEGAL STANDARD

The Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA"), "applies to arbitration agreements in any 'contract evidencing a transaction involving [interstate] commerce.'"  *Swiger v. Rosette*, 989 F.3d 501, 505 (6th Cir. 2021) (quoting 9 U.S.C. § 2).  (*See also* ECF No. 3-1 at PageID 254 (parties agreeing that the FAA would govern the Agreement).)  Under the FAA, courts must enforce valid arbitration agreements and stay court proceedings pending arbitration. *Bazemore v. Papa John's United States, Inc.*, 74 F.4th 795, 797–98 (6th Cir. 2023) ("The [FAA] requires district courts to compel arbitration of claims covered by a valid arbitration agreement. 9 U.S.C. § 4."); 9 U.S.C. § 3 (stating that, when a matter is "referable to arbitration under an agreement," the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement"); *see also* 9 U.S.C. § 2 (stating that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract").  And though the goal of the FAA is to give effect to arbitration agreements, it does not make them more enforceable than any other contract.  *Parker*

*v. Tenneco, Inc.*, 114 F.4th 786, 792 (6th Cir. 2024) (explaining that "[t]he FAA establishes a liberal federal policy favoring arbitration agreements and makes arbitration agreements as enforceable as other contracts, but not more so" (quotation marks and citations omitted) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018); *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022))).

And so, before a court compels arbitration, it decides whether the agreement is an enforceable contract—essentially, whether the parties entered a valid agreement that covers the alleged claims. *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1001 (6th Cir. 2009). And if there are fact issues related to this question, the court "proceed[s] summarily to the trial thereof." 9 U.S.C. § 4.

The Court now turns to the Agreement to see if it is enforceable and covers Plaintiffs' claims here.

## ANALYSIS

Plaintiffs challenge the Agreement's enforceability on multiple grounds. (ECF No. 11 at PageID 278 (noting that Defendant "has not shown that the Arbitration Agreement is enforceable between the parties").) But they do not argue that the claim is outside the Agreement's coverage. (*See* ECF No. 11 (failing to challenge whether the claim falls within the scope of the Agreement).) Even so, the Court addresses each of these issues below.

## I.    Enforceability of the Arbitration Agreement

An arbitration agreement is a contract, so courts look to state law for answers to questions of enforceability. *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411, 416 (6th Cir. 2011) ("Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract

formation."); *see also* 9 U.S.C. § 2 (stating that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). And so, consistent with the FAA, the Court applies Tennessee law to decide whether the Agreement is enforceable. (*See also* ECF Nos. 4, 11, 16 (relying on Tennessee law).)

Relying on Tennessee law, Plaintiffs challenge the Agreement's enforceability on three grounds. (ECF No. 11 at PageID 278 ("Specifically, while Defendant has shown the mere existence of an arbitration agreement, it has not shown that the Arbitration Agreement is enforceable between the parties.").) First, Plaintiffs argue that the arbitration clause is unenforceable because it is unconscionable. (*Id.* at PageID 278–86.) Plaintiffs assert that the number of pages of the contract, relative bargaining power of the parties, prohibitive expense of arbitration, and fiduciary duty the nursing home has to its residents all support their claim that the contract is unconscionable. (*Id.*) Second, Plaintiffs contend that the Agreement did not comply with federal regulations and is unenforceable for that reason. (*Id.* at PageID 286–87.) Finally, Plaintiffs claim that compelling arbitration at this time is inequitable because Defendant has not answered the Complaint. (*Id.* at PageID 288.) The Court will address each argument in turn.

A.    **Unconscionability**

Under Tennessee law, a court will not enforce an unconscionable agreement. *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004) ("If a contract or term thereof is unconscionable at the time the contract is made, a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term."). An unconscionable agreement is one where the "inequality of the bargain is so manifest as to shock the judgment of a person of

common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Id.* Put another way, "[a]n unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice." *Id.* Plaintiffs argue that the contract's length, the parties' bargaining power, the expense of arbitration, and the nursing home's fiduciary duty to residents all favor finding the Agreement to be unconscionable and therefore unenforceable. (ECF No. 11 at PageID 278–86.) The Court takes these arguments in turn.

### 1.    Contract Length

Plaintiffs' first argument about the length or structure of the Agreement is somewhat confusing. They emphasize that the Agreement is numbered as pages 25 through 29 and is part of the "larger Admission Agreement," which it incorporates by reference. (ECF No. 11 at PageID 280–81.) They also contend that "it is unclear whether Plaintiff is in possession of the full admission file." (*Id.* at PageID 280.) While these observations may be true, Plaintiffs do not explain how these aspects of the Agreement make it unconscionable. (*Id.* at PageID 280–81.) In support of their position, Plaintiffs cite only *Raiteri ex rel. Cox v. NHC Healthcare/Knoxville, Inc.*, No. E2003-00068-COA-R9-CV, 2003 Tenn. App. LEXIS 957, at *12 (Tenn. Ct. App. Dec. 30, 2003), which they describe as having considered "the fact that [the] arbitration provision was contained in an 11-page services contract [as] a factor in determin[ing] that [the] arbitration agreement was unconscionable." (ECF No. 11 at PageID 281.)

But when the court in *Raiteri* considered the length of the contract, it did so in relationship to how obvious the arbitration provision was, emphasizing where it fell in the contract, how it used identical font as the rest of the agreement, and that it was "buried" in the

overall admission agreement rather than being "set forth in a separate stand-alone document."
*Raiteri*, 2003 Tenn. App. LEXIS 957, at *12, 26–27.  But here, the Agreement, though part of a
larger Admission Agreement, was a separate, stand-alone document.  *See* ECF No. 3-1 at PageID
253 ("Exhibit B").)  And it explained what its purpose was and what rights the resident was
waiving in its title, "Jury Trial Waiver and Arbitration Agreement."  (*Id.* at PageID 253, 257.)
And again, the capital, bold, underlined text immediately above the signature block stated that
the parties "are giving up and waiving their constitutional right to have any claim decided in a
court of law before a judge and a jury."  (*Id.* at PageID 253, 257.)  *See also Buraczynski v.
Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996) (finding an arbitration provision enforceable when it
was separate and conspicuous).  And so, *Raiteri* provides scant support for finding the
Agreement unconscionable and unenforceable, and the Court rejects Plaintiffs' argument about
the contract length or structure.

### 2.    Bargaining Power

Plaintiffs next argue that the contract is unconscionable and unenforceable based on the
parties' bargaining power.  Plaintiffs explain that, because the contract was "presumably
presented" on a take-it-or-leave-it basis, Allenbrooke "offer[ed] Ms. Blake no meaningful
opportunity to bargain over its terms."  (ECF No. 11 at PageID 281; ECF No. 11-1 at PageID
291.)  Essentially, Plaintiffs argue the Agreement is one of adhesion.  *See Taylor*, 142 S.W.3d at
286 ("The contract signed between [plaintiff] and [defendant] is one of adhesion, in that it is a
standardized contract form that was offered on essentially a 'take it or leave it' basis without
affording [plaintiff] a realistic opportunity to bargain."); *see also Wofford v. M. J. Edwards &
Sons Funeral Home Inc.*, 490 S.W.3d 800, 818 (Tenn. Ct. App. 2015) ("[A] contract may be
found to be procedurally unconscionable if the contract is presented to a party on a take it or

leave it basis and the party is not given the opportunity to understand the agreement." (citation

omitted)).

But the Agreement here is not an adhesion contract that deprived Plaintiffs of the ability

to negotiate.  To be sure, as a corporate facility with more experience in arbitration, the party

offering services, and the drafting party, Allenbrooke had more bargaining power than Plaintiffs.

But Plaintiffs did not need to actively bargain to avoid arbitrating under the Agreement because,

as Defendant correctly points out, the Agreement was not offered on a take-it-or-leave-it basis.

(*See* ECF No. 16 at PageID 302.)  It was voluntary.  In fact, the Agreement expressly states that

"[t]he Resident/Resident's Designated Representative understands that execution of this

Agreement is not a condition of admission to, or requirement to continue to receive care at, the

facility."[1]  (ECF No. 3-1 at PageID 256.)

And the Agreement gave Maclin and Blake an opportunity to change their minds—they

could rescind within thirty days of signing.  (*Id.* at PageID 255 ("The Agreement may be

rescinded by the Resident or the Resident's representative by delivery of written notice to the

Facility within thirty (30) days from the date this Agreement is executed.").)  Boilerplate or not,

this contract language does not somehow deprive Maclin or Blake of the "opportunity for

meaningful choice" or a "realistic opportunity to bargain" over the Agreement's terms.  *Taylor*,

---

[1] Despite this provision's language and her signature on the next page, Blake claims that,
"[b]efore [Maclin] was re-admitted to Allenbrooke, [she] was given a bunch of papers by a
facility representative and told that [she] needed to sign them for [Maclin] to be re-admitted to
the facility."  (ECF No. 11-1 at PageID 291.)  But the contract directly contradicts this assertion.
(*See* ECF No. 3-1.)  And, given the contract language, Blake knew—or at least is treated as
having known—that signing the Agreement was voluntary.  *See Moody Realty Co. v. Huestis*,
237 S.W.3d 666, 676 (Tenn. Ct. App. 2007) ("One who signs a contract cannot later plead
ignorance of its contents if there was an opportunity to read it before signing.  The law will not
allow a party to enter a contract and then seek to avoid performance because he did not read the
agreement or know its contents." (citations omitted)).

142 S.W.3d at 285–86.  (ECF No. 11 at PageID 281; ECF No. 3-1 at PageID 255–56.)  In short, Plaintiffs could have declined to sign the Agreement or could have rescinded it after signing it without risking Maclin's admission to Allenbrooke.  (*Id.*)  But Blake signed the Agreement anyway, and nothing in the record suggests she tried to rescind it.  (ECF No. 3-1 at PageID 257; *see also* ECF No. 11-1.)

And even if it were a contract of adhesion, the Agreement would not be automatically unenforceable.  *See Taylor*, 142 S.W.3d at 286.  Instead, "enforceability of contracts of adhesion generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable."  *Id.* (citing *Buraczynski*, 919 S.W.2d at 320).  In this vein, courts look to whether the contract is "oppressive to the weaker party" or "serve[s] to limit the obligations and liability of the stronger party."  *Id.*  Tennessee courts also consider how clear and conspicuous the agreement was and whether a party can rescind it.  *See Buraczynski*, 919 S.W.2d at 321.

The Agreement here is not "beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable."  *Taylor*, 142 S.W.3d at 286.  In fact, the Agreement is even-handed.  It binds both Plaintiffs and Defendant to arbitration and provides no special procedural benefits to Defendant.  (ECF No. 3-1 at PageID 253 ("It is the intention of the parties to this Agreement that it shall bind the Facility . . . and the Resident . . . .").)  And it does not limit or waive Plaintiffs' substantive rights, statutory protections, or remedies.  (*Id.* at PageID 254 (requiring a "neutral, impartial, and independent" arbitrator to "apply the substantive law (and the law of remedies) of Tennessee" and to "apply applicable statutory and case law to the facts of the claim(s) and [to] apply the burden of proof required by applicable state, federal, or local law, including the Tennessee Health Care Liability Act").)  *See Buraczynski*, 919 S.W.2d at 321

9

("Finally, and perhaps most importantly, the agreements did not change the doctor's duty to use reasonable care in treating patients, nor limit liability for breach of that duty, but merely shifted the disputes to a different forum.").

The Agreement also uses clear, plain language and capital, bold, underlined font to explain that the parties "are giving up and waiving their constitutional right to have any claim decided in a court of law before a judge and a jury." (ECF No. 3-1 at PageID 257.) *See Buraczynski*, 919 S.W.2d at 321 ("The patient is clearly informed by a provision in ten-point capital letter red type, directly above the signature line, that 'by signing this contract you are giving up your right to a jury or court trial' on any medical malpractice claim."). And the Agreement is a separate document with a noticeable title that requires residents to initial each page and separately sign at the end. (*See* ECF No. 3-1.) *See Buraczynski*, 919 S.W.2d at 321 (noting that including a "distinct clause" and requiring the "patient to separately initial it" made it "more obvious"). And the contract provided a thirty-day window to rescind. (ECF No. 3-1 at PageID 255.) *See Buraczynski*, 919 S.W.2d at 321 ("Patients signing these agreements did not immediately relinquish access to the courts, but could revoke the agreements for any reason within thirty days of its execution and regain that right.").

For these reasons, Plaintiffs' bargaining position when executing the Agreement does not suggest unconscionability or unenforceability. This is especially true given the Agreement's even-handed and obvious contract terms.

### 3.    Expense

Plaintiffs' next objection is to the Agreement's fee provision. The fee provision states,

Each party is responsible for paying its own costs and attorney's fees associated with arbitration. If a party prevails on a statutory claim which provides for the prevailing party to receive payment for its attorney's fees, or if there is a written agreement between the parties providing for the prevailing party to receive payment

> for its attorney's fees, the arbitrator(s) may award reasonable fees to the prevailing
> party in accordance with the standards established under such statute or agreement.

(ECF No. 3-1 at Page ID 255.)  Plaintiffs argue that this provision is unconscionable because, by

requiring Maclin to pay his own costs and fees, it makes enforcing his rights in arbitration too

expensive.  (ECF No. 11 at PageID 281–84.)  They support this assertion with evidence of their

contingency-fee agreement with counsel, which requires Plaintiffs to provide no up-front costs

for litigation but to provide them for arbitration.  (ECF No. 11-2 at PageID 293.)  And Plaintiffs

explain in their brief and in Blake's declaration that Maclin "is on a fixed income," the "only

income he receives is his Social Security check" that goes entirely to Allenbrooke.  (ECF No. 11-

1 at PageID 292; ECF No. 11 at PageID 283–84.)  He further notes that he "is insured through

Medicare and TennCare (Medicaid)," suggesting that Maclin cannot afford any up-front costs.

(ECF No. 11-1 at PageID 292; ECF No. 11 at PageID 283–84.)

In response, Defendant emphasizes that Plaintiffs provide no other evidence about

Maclin's financial situation, such as bank account information or a calculation of his assets, or

about the costs of arbitration.  (ECF No. 16 at PageID 304–06.)  Without this information,

Defendant argues, the Court cannot determine whether the costs of arbitration really are higher

than those of litigation or whether those costs would exceed Maclin's financial ability to bring

his claims in arbitration.  (*Id.* at PageID 304–06.)  Alternatively, Defendants contend that the fee-

splitting provision is severable under Tennessee law.[2]  (*Id.* at PageID 307.)

---

[2] In a final effort to save the Agreement and its cost provision, "Allenbrooke affirmatively states
that it will voluntarily pay the costs (not Plaintiff's attorney's fees) associated with the arbitration
of Plaintiff's claims against it."  (ECF No. 16 at PageID 307.)  But a promise to pay arbitration
costs does not allow the Court to bypass an unconscionability analysis.  *See Stokes v.
Allenbrooke Nursing & Rehab. Ctr. LLC*, No. W2019-01983-COA-R3-CV, 2020 Tenn. App.
LEXIS 411, at *13–14 (Tenn. Ct. App. Sept. 15, 2020) ("[W]e reject a party's after-the-fact offer
to pay the costs of arbitration as being relevant to the unconscionability inquiry, just as some

Under Tennessee law,[3] "an agreement to arbitrate that places excessive costs on the claimant as a precondition to arbitration may be unconscionable because of the inequality of the bargain, the oppressiveness of the terms, or the one-sided advantage to the drafter." *Hill v. NHC Healthcare/Nashville, LLC*, No. M2005-01818-COA-R3-CV, 2008 Tenn. App. LEXIS 265, at *48 (Tenn. Ct. App. Apr. 30, 2008).  But the cost provision here has no term that is inherently more favorable to the drafter or the result of unequal bargaining power.  In fact, under the Agreement, each party carries its own costs and fees and is subject to additional costs or fees only to the same extent as the law or other agreement between the parties allows.  (ECF No. 3-1 at Page ID 255.)

That said, these terms, though even-handed, oppress Plaintiffs.  *See Trigg v. Little Six Corp.*, 457 S.W.3d 906, 917 (acknowledging concerns with high arbitration fees "in the abstract" but deciding that plaintiff failed to show the agreement was "prohibitively expensive *to him*" (emphasis in original)).  After all, Maclin is a resident at Allenbrooke and has no income that does not go directly to the facility.  (ECF No. 11-1 at PageID 292.)  And the up-front costs of arbitration—no matter what they may be—exceed the up-front costs Maclin pays in litigation because counsel covers his advanced litigation fees.  (*See* ECF No. 11-2.)  And so, even without

_____

other courts have done.").  And so, this offer does not affect whether the Court finds the provision or Agreement unconscionable.

[3] Consistent with the FAA, the Court applies Tennessee law to these claims as part of the unconscionability—and thus, the enforceability—analysis.  *See* 9 U.S.C. § 2; *Hill v. NHC Healthcare/Nashville, LLC*, No. M2005-01818-COA-R3-CV, 2008 Tenn. App. LEXIS 265, at *43–44, 44 n.15 (Tenn. Ct. App. Apr. 30, 2008) (explaining that federal courts have addressed the enforceability of cost provisions in arbitration clauses "based upon the concept that important rights created or protected by federal civil rights legislation should not be undermined by agreements that made vindication of those rights unlikely due to costs" but that, when "no federally protected interest is at stake, the enforceability of an arbitration agreement must be decided under state contract defenses" (citing *Stutler v. T.K. Constructors*, 448 F.3d 343, 346 (6th Cir. 2006))).

information about Maclin's net worth and the estimated costs of arbitration, the Court finds

Plaintiffs have shown that the cost provision in the Agreement imposes an unconscionable

burden on them.[4]

Having decided the provision is unenforceable, the Court now addresses whether it is

severable.  Under Tennessee law, whether a contract provision is severable depends on the intent

of the parties.  *See Morrison v. Circuit Cty. Stores*, 317 F.3d 646, 677 n.21 (citing *Frizzell*

*Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 85 (Tenn. 1999); *Penske Truck Leasing Co. v.*

*Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990)).  And "illegal contract provisions should not

render the entire contract void unless the 'forbidden provision is so basic to the whole scheme of

a contract and so interwoven with all its terms that it must stand or fall as an entity.'"  *Id.* at 677

n.22 (citations omitted).

The clear intent of the parties here is that any unenforceable provision be treated as

severable.  In fact, the contract language expressly directs severing unenforceable provisions

where possible:

---

[4] Defendant argues that evidence of these financial facts is necessary for Plaintiffs to show a
likelihood of incurring arbitration costs.  (ECF No. 16 at PageID 304–06.)  *See Green Tree Fin.*
*Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000) ("[W]here, as here, a party seeks to
invalidate an arbitration agreement on the ground that arbitration would be prohibitively
expensive, that party bears the burden of showing the likelihood of incurring such costs.").  But
the Court is doubtful that information about Maclin's worth and assets would change the analysis
given his income and his eligibility for Medicaid.  (ECF No. 11-1 at PageID 292.)  And even
without estimated costs of arbitration, the Court can reasonably infer from Blake's declaration
that any up-front costs in arbitration would exceed the up-front costs of litigation that Maclin
pays under his representation agreement with counsel.  (*See* ECF Nos. 11-1, 11-2.)  *See Stokes*,
2020 Tenn. App. LEXIS 411, at *9–10, 14 n.3 (finding a similar arbitration clause unenforceable
when plaintiff's declaration included similar assertions to Blake's declaration here but not
directly deciding the issue).  And in any case, even if Plaintiffs have not presented enough
evidence to show a likelihood of incurring prohibitive arbitration costs, Defendant has agreed to
pay them.  (ECF No. 16 at PageID 307.)  And so, the Court would not enforce the provision
anyway.

> The invalidity of a portion or provision of this Agreement shall not affect the validity of any other portion or provision of the Agreement. If any portion or provision of the Agreement is found to be invalid or unenforceable in any respect, the remainder of the Agreement will remain in full force and effect.

(ECF No. 3-1 at PageID 256.) What is more, the cost provision is not "interwoven with the rest of the [A]greement" in a way that deleting it would "affect[] the rest of the [A]greement's provisions regarding arbitration." And so, the cost provision in the Agreement is severable and does not require the Court to deem the entire Agreement unenforceable. As a result, the Court has no reason to decline compelling arbitration based on the cost provision but **ORDERS** Defendant to pay the arbitration costs here.[5]

### 4. Fiduciary Duty

Lastly, Plaintiffs argue that having Maclin enter the Agreement after being a resident at the facility "potentially" violated Allenbrooke's fiduciary duty to its resident and makes it unconscionable. (ECF No. 11 at PageID 284–86.) And Defendant counters that it did not violate any fiduciary duty because Maclin was not an active resident when Blake signed the Agreement on Maclin's behalf and because "there is no statute or case law that prevents Allenbrooke from obtaining a voluntary agreement to arbitrate from the guardian of a nursing home resident."[6] (ECF No. 16 at PageID 308.)

---

[5] Where courts have found cost provisions against a party to be unenforceable and severable, they order the other party pay the costs. *See, e.g.*, *Stokes*, 2020 Tenn. App. LEXIS 411, at *13–14 ("[W]e reverse the trial court's decision to deny enforcement of the agreement and remand the case to the trial court for the entry of an order compelling arbitration between the parties at Allenbrooke's expense.") And in any case, Defendant has offered to pay these costs. (ECF No. 16 at PageID 307.)

[6] Defendant also contends that, because Blake signed the Agreement instead of Maclin, Allenbrooke could not have violated its fiduciary duty to Maclin. This argument has no basis in law. *See Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 890 (Tenn. 2007), *overruled on other grounds by Welch v. Oaktree Health & Rehab. Ctr. LLC*, 674 S.W.3d 881, 884 (Tenn. 2023) (analyzing a fiduciary relationship in terms of the resident and the nursing home facility even though the resident's power of attorney signed the challenged arbitration agreement).

Tennessee courts have not established a fiduciary duty between nursing home residents and their care facilities. Even "[a]ssuming solely for the purpose of argument that a fiduciary duty *might* arise following a patient's admission to a nursing home, the plaintiff has cited no authority for the finding that a fiduciary duty is owed to a *potential* patient of a nursing home." *See Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 890 (Tenn. 2007), *overruled on other grounds by Welch v. Oaktree Health & Rehab. Ctr. LLC*, 674 S.W.3d 881, 884 (Tenn. 2023). And so, the Court agrees with Defendant that no fiduciary duty existed here because Maclin was being readmitted to Allenbrooke after a hospital stay and thus was not a resident when Blake signed the Agreement on Maclin's behalf.[7] (ECF No. 16 at PageID 308; ECF No. 11-1 at PageID 291–92.)

And in any case, Plaintiffs provide no binding authority that an arbitration agreement between a nursing home facility and resident would violate a fiduciary duty. (ECF No. 11 at PageID 284–86.) Rather, Plaintiffs simply characterize the Agreement as "intended to serve the nursing home, not the resident, in the event the nursing home is sued for abuse or neglect of the resident" and argue that, as a result, it constitutes "a violation of [] trust." (*Id.* at PageID 285–86.) But the Agreement does not necessarily operate to harm Plaintiffs or to benefit Defendant in a way that would violate Maclin's trust or rights in a fiduciary relationship. In fact, the Agreement evenly binds both parties, was voluntary, and could be revoked. These terms suggest that Allenbrooke would not violate a fiduciary duty by proposing this Agreement even if one existed. (*See* ECF No. 3-1 at PageID 254–56.)

---

[7] Because Blake had to sign readmission papers, this is true even though "Allenbrooke kept [Maclin's] bed available." (ECF No. 11-1 at PageID 291.)

For these reasons, the Court does not find a fiduciary duty existed here. And even if it did, nothing in the facts suggests this Agreement violated that duty. And so, the relationship between the parties does not provide grounds for finding the Agreement unconscionable or unenforceable.

### B.     Federal Compliance

Next, Plaintiffs contend that the Agreement is unenforceable—or, at a minimum, that enforceability is a question of fact for a jury—because Blake did not know or understand the effect of the Agreement as required under 42 C.F.R. § 483.70(m)(2). (ECF No. 11 at PageID 286–87; ECF No. 11-1.) The regulation states that facilities like Allenbrooke that "ask a resident or his or her representative to enter into an agreement for binding arbitration" must ensure

> (i) The agreement is explained to the resident and his or her representative in a form and manner that he or she understands, including in a language the resident and his or her representative understands; [and]
> (ii) The resident or his or her representative acknowledges that he or she understands the agreement[.]

42 C.F.R. § 483.70(m)(2). But this regulation does not convince the Court that the Agreement is unenforceable for two reasons.

First, the regulation relates to a nursing facility's ability to participate in Medicaid and Medicare. 42 C.F.R. § 483.1(b) ("The provisions of this part contain the requirements that an institution must meet in order to qualify to participate as a Skilled Nursing Facility in the Medicare program, and as a nursing facility in the Medicaid program."). The regulation has nothing to do with the enforceability of arbitration—or even admissions—contracts between a facility and its residents. *See id.*; *see also Northport Health Servs. of Arkansas, LLC v. U.S. Dept. of Health and Human Servs.*, 14 F.4th 856, 868 (8th Cir. 2021) ("The Revised Rule . . . does not invalidate or render unenforceable any arbitration agreement. Instead, it establishes the

conditions for receipt of federal funding through the Medicare and Medicaid programs."
(citations omitted)); *Hunter v. Glob. Abbeville, LLC*, No. 1:23-CV-3521-TWT, at *29 (N.D. Ga.
Jan. 24, 2024) ("[T]here is no issue in this case regarding [Defendant's] status as a skilled
nursing facility, and the Plaintiff points to no authority holding that an arbitration agreement with
a long-term care facility resident that does not comply with 42 C.F.R. § 483.70(n) is legally
unenforceable.").[8]  And so, noncompliance with this regulation does not appear to be an
acceptable basis for finding an arbitration agreement unenforceable.  *See Northport*, 14 F.4th at
868.  And Plaintiffs, who have the burden to show the Agreement's unenforceability, have
provided no authority on this point.  (ECF No. 11 at PageID 286–87.)  *Green Tree Fin. Corp.-
Alabama v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden
of proving that the claims at issue are unsuitable for arbitration.").

      Second, even if violating 42 C.F.R. § 483.70 could be grounds for invalidating an
arbitration agreement, these facts do not demonstrate noncompliance.  Blake attests that a
representative at Allenbrooke gave her forms to sign "for [Maclin] to be re-admitted to the
facility" but that "[n]obody ever explained any of these documents to [her] or discussed them
with [her]."  (ECF No. 11-1 at PageID 291–92.)  She adds that "[n]obody explained the meaning
or effect of an arbitration agreement to [her] at the time [she] signed it" and that she did not
understand it until after filing this case.  (*Id.* at PageID 292.)

      But the language of the Agreement directly disproves that claim.  Just above her
signature, the Agreement explains in capital, bold, and underlined letters that she understands
that she and Maclin are forfeiting any jury right and that the Agreement was explained to her in a

---

[8] These cases cite 42 C.F.R. § 483.70(n), but the June 2024 version of the regulation moves the
requirements for binding arbitration agreements to subsection (m).  The relevant language is
identical between both versions.

form and manner she understood.  (ECF No. 3-1 at PageID 257.)  And Blake's signature

immediately follows.  (*Id.*)  Her assertions that she did not understand the Agreement and that it

was not explained to her contradict what her signature indicates in the Agreement.  This is not

enough to make the Agreement unenforceable.  *See Moody Realty Co. v. Huestis*, 237 S.W.3d

666, 676 (Tenn. Ct. App. 2007) ("One who signs a contract cannot later plead ignorance of its

contents if there was an opportunity to read it before signing.  The law will not allow a party to

enter a contract and then seek to avoid performance because he did not read the agreement or

know its contents." (citations omitted)).  And a later plea of ignorance is also not enough to

create a question of fact about the Agreement's validity that would trigger a jury right under 9

U.S.C. § 4.[9]

    For these reasons, the record and Agreement do not support a finding that Allenbrooke

failed to comply with 42 C.F.R. § 483.70.  And even if it violated the regulation, Plaintiffs

---

[9] Under 9 U.S.C. § 4, "[i]f the making of the arbitration agreement or the failure, neglect, or
refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."  A
question about the "making" of the agreement generally refers to whether the signatory signed the
contract or was a party to it.  *See Bazemore*, 74 F.4th 795 (finding a genuine issue of material
fact when plaintiff raised issues about whether he or someone else using his account signed the
arbitration agreement); *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-
Stratton*, 816 F.2d 864 (2d Cir. 1989) (requiring an evidentiary hearing when it was unclear who
was a party to the contract); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494 (7th Cir. 2003)
(requiring a trial where there was a question of fact about a signature's authenticity).  But
Plaintiffs do not argue that they were not signatories or parties to the Agreement and only
challenge the Agreement's enforceability.  (ECF No. 11 at PageID 278 (acknowledging that
"Defendant has shown the . . . existence of an arbitration agreement" but not that it is
"enforceable between the parties").)  And that is not enough to create a material question of fact
on the "making" of the Agreement under § 4.  *See also Mazera*, 565 F.3d at 1002 (explaining
that, even though plaintiff's affidavit "raises several factual issues," including "his degree of
understanding of the contract," the statements in the affidavit were not "material with respect to
the validity of the arbitration agreement"); *id.* ("A naked assertion . . . by a party to a contract
that it did not intend to be bound by the terms thereof is insufficient to place in issue 'the making
of the arbitration agreement' for the purposes of Section 4 of the [FAA]." (quoting *Par-Knit
Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 55 (3d Cir. 1980))).

provide no authority that the Regulation applies to these facts and that noncompliance somehow makes the whole agreement unenforceable.

### C.    Procedural Equity

Finally, Plaintiffs claim that allowing Defendant to compel arbitration when it has not answered the Complaint is inequitable because the answer could implicate third parties who would not be bound by the Agreement.  (ECF No. 11 at PageID 288.)  In support of its argument, Plaintiffs cite *River Links at Deer Creek, LLC v. Melz*, 108 S.W.3d 855 (Tenn. Ct. App. 2002), claiming that it "hold[s] that arbitration is not appropriate where 'a comprehensive resolution of the dispute cannot be obtained.'"  (ECF No. 11 at PageID 288.)  To be sure, Plaintiffs accurately describe *part* of what the Tennessee Court of Appeals said.[10]  But the Tennessee Court of Appeals said much more.  In fact, on the issue of having some parties subject to arbitration when others are not—which is the basis of Plaintiffs' equitable argument here—*River Links* came to the opposite conclusion.  The Tennessee Court of Appeals affirmed the trial court's decision to compel arbitration against the entity defendants even though the individual defendant, who was "a necessary party to a complete resolution of th[e] dispute," was not subject to the arbitration clause and could not "be compelled to arbitrate in the absence of a contractual obligation."  *Id.* at 859–60.  And so, even if Defendant asserts a third-party defense against someone not covered by the Agreement, *River Links* still supports compelling arbitration against Allenbrooke.

What is more, a review of other cases suggests a defendant may move to compel arbitration before answering the complaint.  *See, e.g.*, *Green Tree*, 531 U.S. at 83 ("In lieu of an

---

[10] *River Links* concludes that arbitration was not appropriate on a declaratory judgment claim "whe[n] only a few of the issues between the parties are subject to arbitration" and when the case presented a "question of first impression" that would require "a great deal of time and energy to reach a well-considered conclusion" that would not have precedential value.  *River Links*, 108 S.W.3d at 861.  But similar multi-claim or novel issues are not before the Court here.

answer, petitioners filed a motion to compel arbitration, to stay the action, or, in the alternative, to dismiss."); *Dawson v. Rent-A-Center, Inc.*, 490 F. App'x 727, 729 (6th Cir. 2012) (remanding for the district court to compel arbitration in a case in which defendant "filed a motion to compel arbitration . . . and to dismiss in lieu of an answer").  And requiring Defendant to answer the substantive claims of the Complaint would force it to litigate the merits of this matter in federal court—the exact thing the Agreement tries to prevent.  Thus, it is appropriate for this Court to address the enforceability and scope of the Agreement, and to decide whether to compel arbitration, before Defendant answers.  Doing so allows Defendant to reap the full benefits of its agreement to arbitrate.

## II.    Scope of the Arbitration Agreement

Because arbitration agreements are contracts "on equal footing with all other contracts," courts "rigorously enforce arbitration agreements according to their terms."  *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021) (quotation marks and citations omitted). Plaintiffs here raise no questions of interpretation over the Agreement's terms or argue that their claims fall outside the scope of the Agreement.  (*See generally* ECF No. 11 at PageID 278 (failing to raise any question about the scope of the Agreement).)  And for good reason.  The Agreement covers the claims here.

Under the Agreement, "[t]he parties understand and agree that all claims, disputes, and controversies of any kind between the parties arising out of or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration."  (ECF No. 3-1 at PageID 253.)  This includes claims for "negligence, medical malpractice, wrongful death, or any other claim based on any departure from accepted standards of medical, nursing, or health care whether sounding in tort or

20

contract . . . ." (*Id.*)  And Plaintiff alleges "negligence pursuant to the Tennessee Medical

Malpractice Act" and "gross negligence, willful, wanton, reckless, malicious and/or intentional

misconduct" for the allegedly insufficient care and supervision Allenbrooke provided Maclin.

(ECF No. 1-3 at PageID 129–32.)  As a result, the scope of the Agreement covers Plaintiffs'

claims here.  (*See id.*; ECF No. 3-1 at PageID 253.)

What is more, had Plaintiffs questioned the validity or scope of the Agreement, the Court

would have required the parties to address these preliminary questions in arbitration rather than

in this Court.  The Agreement here states that it applies to "any dispute arising out of or in any

way relating to the Agreement (including its validity and/or enforceability)," thereby expressly

delegating questions of "validity and/or enforceability" to arbitration.  And so, these threshold

questions about the arbitration clause's unconscionability—which would make the Agreement

unenforceable—would have been questions for arbitration proceedings under the FAA.  *See*

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71–76 (2010) ("An agreement to arbitrate a

gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks

the federal court to enforce, and the FAA operates on this additional arbitration agreement just as

it does on any other."); *Ciccio*, 2 F.4th at 583 ("Whether the parties have agreed to arbitrate or

whether their agreement covers a particular controversy are gateway arbitrability questions.

Usually these are for a court to decide.  But parties may decide to send these gateway questions

to an arbitrator rather than a court.  That's called a delegation provision." (quotation marks and

citations omitted)).

In the same way, each of Plaintiffs' other arguments to avoid arbitration also turn on

questions of enforcement, and the Court would have sent those questions to arbitration too.  (*See*

ECF No. 11 at PageID 278.)  And so, the Court would have compelled arbitration on these

preliminary issues about the appropriateness of arbitration under the Agreement's delegation clause and allowed the arbitrator to decide whether the parties agreed to arbitrate the tort claims. But, as neither party raised the issue, both have waived it. *See Swiger*, 989 F.3d at 505–06 (requiring a party to raise a "specific challenge" to a delegation clause or to waive the challenge); *see also Rent-A-Center*, 561 U.S. at 71–76 (considering a specific challenge to the delegation clause waived when the party only broadly challenged the entire arbitration agreement). (*See generally* ECF Nos. 4, 11, 16 (failing to mention—let alone challenge—the delegation clause).)

## <u>CONCLUSION</u>

For the reasons explained above, Court **GRANTS** Defendant's motion to compel arbitration, **STAYS** these proceedings pending arbitration, and **ORDERS** Defendant to pay the arbitration costs.

**SO ORDERED**, this 19th day of March, 2025.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

22